[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action was commenced on February 14, 1994 by plaintiff Richard B. Polivy ("Polivy") by Writ of Replevin against Air One, Incorporated ("Air One") and Brainard Flight Services, Incorporated ("Brainard"). Polivy sought possession of a Rockwell Commander General Aviation Aircraft in which he claimed a security interest.
On March 28, 1994 Polivy amended his complaint by adding a claim for declaratory judgment pursuant to General Statutes § 52-29. He requested that the court decide whether he or CT Page 3568 defendant Air One held a superior secured right to the aircraft (Amended Complaint dated March 28, 1994).
On March 30, 1994 Arstol, Inc. ("Arstol") filed a motion to intervene and become a party to the action. Arstol claimed it had become a successor-in-interest to defendant Air One's security interest in the plane. Thus, as of March 30, 1994 both Polivy and Arstol claimed security interests in the aircraft. In early June 1994 Arstol filed an answer, special defenses, and a counter-claim.
In regard to the amended complaint defendants Air One and Arstol filed joint motions for summary judgment on September 30, 1994. Polivy filed a cross motion for partial summary judgment on November 10, 1994. In their motions Arstol and Polivy each argued that they had a superior security interest in the aircraft.
After hearing, the court (Sheldon, J.) determined that defendant Arstol's first-filed security interest was superior to the later-filed security interest of Polivy. (See memorandum of decision dated June 13, 1995). Judge Sheldon left Arstol's counterclaim to be determined at a later time. Thus, before this court is defendant Arstol's counterclaim dated June 6, 1994.
The first count of the counterclaim is in conversion. Arstol claims as follows:
"1. On or about March 1, 1993, the defendant Arstol, Inc., (hereafter Arstol), was an assignee of a note and security interest recorded with the Federal Aviation Administration Aircraft Registry on March 15, 1993, Conveyance No. T43941.
"2. Said assignment was received from Capitol [sic] Assistant Corporation, (hereafter Capital). The original note was with Brainard Flight Services, Inc. (hereafter Brainard) from Air One.
"3. When Arstol became the assignee of said note and security interest, it notified the parties and demanded payment.
4. Brainard defaulted for failure to make payment upon CT Page 3569 demand.
"5. Thereafter, Arstol legally took possession of the aircraft and its component parts.
"6. The plaintiff, defendant in this action, personally, or through his agents, servants and/or employees, then, without legal means, took the aircraft from the possession of Arstol, Inc. and removed it to parts unknown.
"7. This action on the part of Arstol [sic] is a conversion of property belonging to Arstol to deprive Arstol the use of said aircraft and of the collateral secured therein and damaged Arstol.
"8. Despite demand, the plaintiff, defendant in this action, refused to return the vehicle. Arstol then requested an order from the Court returning the aircraft, which Order was issued by Judge Norris L. O'Neill on April 7, 1994."
The second count of the counterclaim alleges interference with contractual rights. Arstol claims as follows:
"1. Paragraphs 1 through 8 of the First Counterclaim are hereby incorporated and made paragraphs 1 through 8 of this Second Counterclaim.
"9. The action of the plaintiff, defendant in this action, in removing the plane from New Hampshire without knowledge or permission from Arstol, constituted an unlawful interference in the rights Arstol had in and to the aircraft, and deprived Arstol the rightful possession of the aircraft and its use.
"10. Arstol, deprived of the aircraft, caused Arstol to be damaged."
The third count of the counterclaim alleges negligence. Arstol claims as follows:
"1. Paragraphs 1 through 10 of the Second Counterclaim are hereby incorporated and made paragraphs 1 through 10 of this Third Counterclaim.
"11. On or about May 3, 1994, the plaintiff, defendant in CT Page 3570 this action, acting upon an Order of the Superior Court, (O'Neill, J.), by himself or his agents, servants and/or employees, was obligated to return the subject aircraft to Brainard.
"12. The plaintiff, defendant in this action, by himself or through his agents, servants and/or employees, flew the aircraft back to Brainard but did not notify any representative of Arstol that the aircraft was being returned.
"13. Upon inspection, it was discovered that the aircraft suffered extensive fire damage during flight and while in the care, custody and control of the plaintiff, defendant in this action.
"14. Said losses were caused by the carelessness and negligence of the plaintiff, defendant in this action, his agents, servants and/or employees, in one or more of the following ways:
 a. in that the aircraft was not inspected prior to takeoff;
 b. in that the aircraft was flown without the same being airworthy;
 c. in that the conditions causing the fire were or should have been known to the plaintiff, defendant in this action, but he failed to reasonably notice the condition.
 d. in that he flew the aircraft that was not reasonably, under the circumstances, flight ready;
 e. in that he failed to notice the fire and take steps to stop it;
 f. in that he knew or should have known that the aircraft could be damaged if flown in the condition it was in, yet he nevertheless flew the plane;
g. in that he failed to take reasonable and CT Page 3571 prudent steps to avoid the fire;
 h. in that he knew or should have known that a fire would or could occur with the conditions existing on the aircraft, yet he failed to take steps to prevent the condition;
 i. in that the aircraft was not reasonably safe;
 j. in that he failed to exercise the care that a reasonably prudent pilot would have exercised.
"15. As a result of the carelessness and negligence of the plaintiff, defendant in this action, the aircraft caught on fire and was damaged."
A trial was held on September 13, 14 and November 15, 1995. The court finds the following facts:
On December 1, 1992 Air One loaned $65,000 and sold three aircraft to Brainard. One of the aircraft, a Rockwell Commander, is the aircraft in dispute in this action. Air One took back a note and a security agreement when it sold the three aircrafts to Brainard. The security agreement dated February 22, 1993 was recorded with the Federal Aviation Administration on March 15, 1993 (Exhibit 2).
On August 11, 1993 Brainard executed a promissory note in favor of Polivy in the original amount of $20,000. As security for this note Brainard executed an aircraft mortgage and a Uniform Commercial Code Financing Statement in favor of Polivy. The mortgage granted Polivy a lien on the Rockwell Commander aircraft. Polivy recorded the UCC Statement with the Connecticut Secretary of the State on October 8, 1993 and the mortgage with the FAA on October 28, 1993.
Prior to February 14, 1994 Brainard defaulted on its obligations to Polivy and Air One under the Polivy note and the Air One note.
Thereafter by complaint dated February 14, 1994 Polivy commenced this action against Air One and Brainard seeking to CT Page 3572 replevy the Commander in satisfaction of Brainard's unpaid debt on the Polivy note. The pleadings were returned to court on February 24, 1994.
On February 22, 1994 a corporation was formed and started under the name of Arstol, Inc., the claimant in this counter-claim. (See Sheldon's decision. dated June 13, 1995).
On February 25, 1994 after commencement of this action, Air One assigned its interest in the Air One note and security agreement to Capital Assistance Corporation ("CAC"). On March 1, 1994 CAC assigned its interest in same to the newly formed corporation. Arstol, Inc. (Exhibit 4).
On March 11, 1994 Arstol removed the Commander aircraft from Brainard Field and took it to Keene, New Hampshire. Arstol gave notice to Brainard that it had done so, but gave no notice to Polivy. Arstol knew when it took the plane out of Connecticut that Polivy's lawsuit was pending. (T Sept. 9-13
at page 68). On the date when the plane was taken to New Hampshire and prior thereto it had a chain on it and a tag stating that the plane was in the possession of Connecticut Air Motive. Connecticut Air Motive, Inc. had locked the aircraft and was holding it in its possession as security for unpaid repair bills.
Also on March 11th a restraining order was in effect in regard to the Rockwell Commander (as well as the other two aircraft subject to the security interest of Air One.) A dispute had arisen between Brainard and Air One and a lawsuit was pending between them. (Brainard Flight Services, Inc. v.Air One, Inc., CV-93-704865S, Judicial District of Hartford/New Britain at Hartford). In that case, as of the first week of February, the court (Judge O'Neill) had issued a restraining order in which it ordered Air One not to interfere with the use, possession or operation of the three aircraft in the hands of Brainard Flight Service.
Thus, despite the restraining order, despite the fact that the plane was chained, and despite the fact that Arstol was aware of the plaintiff's pending lawsuit, Arstol saw fit to move the plane out of the state. Polivy, who had begun the replevin action in February had not sought a prejudgment writ of replevin because he knew of the pre-existing restraining order entered by Judge O'Neill against Air One. He thus CT Page 3573 decided that all he needed was a determination of who had priority to the plane. (Transcript, 9-15-95, page 65)
On March 14, 1994 Polivy went to Brainard Airport and found that the Rockwell Commander was missing. The other two planes that were collateral for the notes by Brainard to Air One were there, however, with chains disabling them. Polivy tried to find out from Air One what had happened to the Rockwell Commander but was unable to get an answer. Accordingly, he called the Hartford Police Department to report a theft of the aircraft. He knew there was insurance on the aircraft covering theft which was about to expire and wanted to preserve any claim for coverage purposes.
After investigation the police department sent a FAX of a March 1, 1994 letter to Polivy. The letter was from Arstol, Inc. to John Nunes at Brainard containing notice of the transfer of the Air One note debt lien to Arstol and indicating that Arstol had taken possession of the plane. As of March 17th Polivy had never heard of Arstol or that Arstol was Air One's assignee. Although he made several phone calls over the next several days, he was unable to speak to anyone representing Air One or Arstol who could give him information about the missing plane.
On March 20, 1994, Polivy discovered that the missing plane was located at an airport in Keene, New Hampshire. The plane was sitting on the ramp tied down, and it had a chain on its prop with a lock and a tag. The tag said "Do not fly, property of Connecticut Air Motive." Although Polivy tried to make inquiry about the plane being located in Keene, he was unable to get any satisfactory answers. He flew back to Connecticut, talked with John Grier of Connecticut Air Motive and found out that Connecticut Air Motive had no further interest in the plane.
While in Connecticut he called the Secretary of the State's office and received notice that Arstol was a corporate entity recently filed. Also he obtained the name of an agent for service. He thus sent several letters, certified and uncertified, to persons connected with Arstol but received no response. Neither Arstol nor Air One was willing to give him any information about the taking of the plane.
On March 23, 1994 Polivy flew back to Keene, New CT Page 3574 Hampshire and found the plane was still there. He did an inspection of the plane and found that there was water in the fuel which he drained out. In addition, there was a crack in the tail, which he had been aware of previously, and a missing door handle. He removed the chain and asked his companion, Richard Sheath, to fly the plane to Ware, Massachusetts, which he did. Polivy had arranged to have the plane flown to Ware in order to protect his security interest.
When the plane arrived at Ware, Polivy had it moved to an area designated as a safe area for storage. He then proceeded to cover the various air vents and openings in the aircraft in an attempt to keep dirt and grass from getting into the plane.
Polivy next prepared a notice of repossession which made reference to his actions as a secured party and his actions in repossessing the plane. The notice also made reference to his pending lawsuit. He taped the notice in the window of the plane. Thereafter he prepared the March 28th amendment to the complaint mentioned above because he wanted to advise the court that he was in possession of the plane and was looking for a declaratory judgment as to the priorities of the lien. On March 30, 1994 Arstol intervened in the case.
Arstol moved to have the aircraft returned to Connecticut and a hearing was held on April 4, 1994 before Judge O'Neill. At that hearing Polivy, through his counsel, requested that the plane be sold, but Arstol did not agree.
At the hearing Judge O'Neill ordered that the plane be made available to Arstol to be returned to Connecticut and that it be ready to be flown from Ware by 12:00 p.m. on April 8th. Arstol had insisted on sending its own pilot to Ware to retrieve the plane, and Polivy thus notified the Ware airport to make the plane available. When John D. Olson went to pick up the plane for Arstol he claimed it was unairworthy and refused to fly the plane. He claimed that he found corrosion on the rudder approximately five or six inches long, a missing handle for locking and unlocking a door and contamination in the fuel. These were the same defects which Polivy had noticed when he found the plane in Keene, New Hampshire.
Another hearing was held before Judge O'Neill who ordered Polivy to bring the plane back or be found in contempt. CT Page 3575 Polivy went up to Ware with Richard Sheath on May 3rd. They did a pre-flight inspection and found water in the right tank and drained it out. They found no evidence of a bird's nest, twigs, grass, bird droppings on any part of the plane. Sheath found the plane to be airworthy and flew the plane back to Connecticut.
Judge O'Neill's order of April 7th specified that upon arrival at Brainard Field the aircraft was to be locked, secured and placed in a secure, indoor hangar belonging to Air One. In spite of the order, the plane was kept outside for weeks at a time while the declaratory action brought by Polivy was pending. This was not the fault of Polivy.
Judge Sheldon's decision dated June 13, 1995 held that Arstol's security interest took precedence over Polivy's security interest. Subsequently, on September 12, 1995 Arstol proposed to retain the aircraft in full satisfaction of any amounts owed to it by Brainard. Polivy and Brainard consented to this action.
After hearing all the evidence the court finds that Arstol has failed to prove its claim of conversion on the part of Polivy. In fact, the court believes this to be an example of the pot calling the kettle black. If Arstol and/or Air One had not taken the plane out of the state in the first place, when there was a restraining order in effect, the dispute between the parties could have been solved in a far more appropriate manner.
The tort of conversion occurs when one, without authorization, assumes and exercises the right of ownership over property belonging to another, to the exclusion of the owner's rights. Maroun v. Tarro, 35 Conn. App. 391 (1994). To succeed in its suit for conversion Arstol was required to prove legal ownership or the immediate superior possession to the plane. Devitt v. Manulik, 176 Conn. 657, 660 (1979). Arstol failed to prove that, at the time when Polivy took the plane from New Hampshire to Massachusetts, it was the owner of the plane or had an immediate right to possession of the plane. Clearly, there was an action pending between Air One and Brainard as well as the replevin action started by Polivy.
In contrast to Arstol's actions, Polivy took all reasonable steps to determine the ownership and/or possession CT Page 3576 of the plane after discovering it was located in Keene, New Hampshire. Despite his reasonable efforts, officials at the airport were unable to give him any information. The evidence showed that Air One and Arstol refused to give him any information about their status or involvement with the aircraft.
The court finds that the actions on the part of Polivy were directly and proximately caused and induced by the improper actions of Arstol and Air One. Luciani v. Stop Shop Cos., 15 Conn. App. 407, 412. The court infers from the evidence that Arstol was created and the plane moved to Keene, New Hampshire in order to frustrate Polivy's replevin action and to avoid the effects of the restraining order on Air One. Once the aircraft's new location was discovered by Polivy, both Arstol and Air One refused to give Polivy any information about their claims or rights with respect to the aircraft. They also refused to confirm whether or not the aircraft had even been repossessed.
Based in part on these disclaimers of information by Arstol and Air One, combined with the fact that Arstol left tags on the aircraft indicating that it was in possession of Connecticut Air Motive, any allegedly improper action on the part Polivy in exercising his security interest rights must be directly attributed to the deliberate actions and inactions of Arstol and Air One. Under these circumstances, plaintiff Arstol's own improper actions of (i) trying to avoid this replevin action, (ii) trying to hide the aircraft in Keene, New Hampshire, (iii) misleading Polivy about its interest or involvement in the aircraft, and (iv) misleading Polivy by leaving a Connecticut Air Motive sign on the aircraft, must prevent plaintiff Arstol from claiming any recovery from Polivy for conversion.
The court also finds that Arstol has failed to prove its claim of interference with contractual rights. Inasmuch as the court has found that Polivy acted reasonably under the circumstances, there can be no finding that he interfered with any contractual rights of Arstol. Polivy had a security interest in the plane, and Connecticut Air Motive had disclaimed any right to possession. Since no other party would claim ownership or possession of the aircraft when he removed it to Massachusetts, he hardly acted tortiously. "In order to succeed on a claim of tortious interference with CT Page 3577 business expectancies, . . . the plaintiff must do more than show that the defendant's action caused a loss to the plaintiff's business. `A cause of action for tortious interference with a business expectancy requires proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously.'" Sportsmen's Boating Corporation v. Hensley,192 Conn. 747 (1984); Busker v. United Illuminating Co.,156 Conn. 456, 461, 242 A.2d 708 (1968); Skene v. Carayanis,103 Conn. 708, 715; Goldman v. Feinberg, 130 Conn. 671; KeckoPiping Co. v. Monroe, 172 Conn. 197. Arstol has failed to prove this claim.
In the third count of the counterclaim Arstol alleges that Polivy was negligent in his care of the plane and that his negligence was the cause of a fire. The court does not believe that Arstol met its burden of proof in this regard. On both occasions before the plane was flown by Richard Sheath (from New Hampshire to Massachusetts and from Massachusetts to Connecticut) pre-flight inspections were made by Polivy and Sheath. Sheath, Polivy's flying instructor, determined that the plane was airworthy. When the plane arrived in Massachusetts from New Hampshire Polivy took reasonable steps to block openings that were likely to create a problem in storage and he arranged to have the plane moved to a place designated as a safe area.
When the pre-flight investigation was performed prior to returning the plane to Connecticut, there was no evidence of any birds' nest anywhere on, in or under the plane that could be seen. Polivy had removed the covers which he had previously installed. There was no evidence of twigs or grass, no bird droppings on the prop, and no bird droppings on any part of the plane, tail, wing, or otherwise. (Transcript September 14, page 141.) Sheath agreed to fly the plane to Connecticut.
As Sheath taxied down the runway before taking off for Connecticut, Polivy, who was in another plane, noticed that smoke was coming out of the bottom of the Commander. Sheath and Polivy got out of their respective planes and did another inspection. They took the cowling off and looked inside but there was no evidence of whatever had been there. The bottom of the cowl did indicate paint crumpling, rippling, and it looked like there had been some paint bubbling. After further CT Page 3578 investigation, however, Sheath, who decided the plane was airworthy, got in the plane and flew it back to Connecticut without further incident.
The court does not believe that Arstol presented any credible evidence which would show that Polivy failed to act as a reasonably prudent pilot would have acted under all the circumstances. He was ordered by the court to return the plane to Connecticut, and he did so after it was determined by Richard Sheath that the plane was airworthy. It is unclear what caused the smoke at the bottom of the plane, but the court does not find that the smoke was caused by the negligence of Polivy.
In summary, the court finds that Arstol has failed to prove any of its claims set forth in the counterclaim.
Accordingly, judgment may enter for Polivy on the counterclaim.
Frances Allen State Trial Referee